IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN V. WILLIAMS,                        )
                                         )
        Plaintiff,                       )
                                         )
vs.                                      )     Case No. 2:08-cv-2269-TMP
                                         )
REGIONAL PLANNING COMMISSION             )
OF GREATER BIRMINGHAM,                   )
                                         )
        Defendant.                       )

## MEMORANDUM OPINION

This cause is before the court on the defendant's motion for summary judgment (Doc. 10), filed August 3, 2009. Plaintiff filed an opposition to the motion (Doc. 13) on August 31, 2009, to which defendant replied on September 9, 2009. (Doc. 17). Plaintiff John V. Williams has alleged claims against his former employer, Regional Planning Commission of Greater Birmingham ("RPC") for discrimination on the basis of his alleged disabilities. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c), and the matter has been fully briefed; accordingly, the court enters this Memorandum Opinion.

SUMMARY JUDGMENT STANDARDS

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## SUMMARY JUDGMENT FACTS

Applying these standards to the evidence in the record, the following facts appear to be undisputed or, if disputed, are taken here in the light most favorable to the non-moving plaintiff. Plaintiff first was employed by RPC in April of 2002, working part-time on an air quality program, assisting the project manager. In August 2002, he was placed in charge of the program and his work hours were increased from 10 hours per week to about 30 hours per week. He was supervised by Bill Foisy. He became a full-time employee in 2004 at the behest of the RPC executive director, Larry Watts.

In 2006, the RPC hired a new executive director, Charles Ball. Foisy warned Williams, in a memorandum dated December 19, 2006, that he was showing a lack of progress on a project, and that he had taken leave in excess of what was available to him in accumulated leave. Foisy advised Williams to "rectify [his] absenteeism" or explore "options for medical leave and part-time employment." In the memorandum, Foisy told Williams that the letter was "a warning that a failure to meet the agreed upon expectations may be grounds for future disciplinary action."

On January 2, 2007, Williams asked to be returned to part-time status, working 30 hours per week. Williams submitted a written request for part-time status, but did not make any mention of any disability, and did not submit any request for any sort of medical leave. Williams' request to work part-time was granted, and he again became a part-time employee.

Williams received another warning on January 22, 2007, this time from Executive Director Ball, which again criticized Williams for failing to complete tasks and for excessive absenteeism. Ball informed Williams that the memorandum served "as an official warning for not having

completed the tasks" detailed in the December memo, and further noting that Williams needed to address his absenteeism issues. As a result of his absenteeism, Williams was docked 14 hours of pay from his November 30, 2006, paycheck. He also was docked 21.2 hours of pay in both his December 15, 2006, and January 15, 2007, paychecks for taking leave he had not earned and accumulated.

In April 2007, Williams requested permission to remove a wall between his cubicle and the empty adjacent cubicle in the RPC offices in order to enlarge his work area. His request was denied, but, over a weekend, Williams removed the wall anyway, after seeking and receiving assistance from co-workers. When this was discovered, Williams was instructed to reconfigure the workspace. On May 3, 2007, Ray Morris, RPC's Director of Operations and Information Services, sent Williams an email that stated: "Enough time has elapsed that I would have expected you to reconfigure your workspace. Please advise when you will have this task completed." Williams responded that he had been "given two months to put walls back the way they were" and that he did not "anticipate" that it would take that long to do so. His response made no mention of a physical disability that would hinder the replacement of the cubicle walls. Williams asserts that he told his employer that his back condition would hinder his ability to move the cubicle walls back into place without assistance.

In June 2007, Williams was given another memorandum critical of his work performance and noting that his attendance had improved in February, but "has since degraded again." He was then returned to a full-time, 40-hour-per-week status and told to work regular hours of either 8:00 a.m. to 5:00 p.m. or 8:30 a.m. to 5:30 p.m. Mondays through Fridays. He was told that "habitual tardiness and absenteeism will result in your suspension or termination."

5

Williams also came under fire at work during City Stages,[1] an musical event at which the RPC was a sponsor. Williams was responsible for a hotel room rented by the RPC in which condoms and marijuana were found after the event. He admitted that he was responsible for the condoms, but denied any knowledge of the marijuana. Williams also was involved in an automobile accident while using an RPC vehicle during City Stages. He failed to notify the RPC executive director about the accident until the Tuesday after the weekend accident, and then did so only "casually." Ball issued a memorandum to Williams on June 28, 2007, directing Williams to immediately provide a copy of the accident report, and telling Williams that "this type of behavior will no longer be tolerated." Williams agreed to provide the report the next day. Williams now asserts that the accident report was not available from the police at that time, although he did not tell his employer that was the reason for the delay at the time. Williams then took a vacation to New York before providing the accident report to Ball.

On July 10, 2007, Ball again wrote a memo criticizing Williams for failing to provide the accident report before leaving on vacation, and for failing to restore his workspace to the original configuration within the 60-day period he was given. At that time, he was placed on unpaid leave for three days, and was told that "any additional infractions will result in [his] immediate dismissal."

On August 6, 2007, after Williams failed to turn in his July time sheets, Ball sent an email directing him to turn in the time sheets no later than noon on that date. Williams failed to do so. Ball hand-delivered a letter to Williams on August 10, 2007, which stated that Williams' quality of

---

[1] City Stages (now-defunct) was an annual, three-day musical festival staged in downtown Birmingham that attracted tens of thousands of music enthusiasts to hear music performed on several stages.

work, attendance, and overall behavior had "continued to deteriorate and [had] in fact become increasingly erratic"since the January 2007 memorandum.  The letter further stated that, based upon Williams' "contempt for supervision, disregard for RPC policies ... and a general lack of professionalism," he was suspended without pay until August 17, and might be discharged at that time.  Williams was told that he could request a pre-discharge conference, which he did.  Williams told RPC that he had hired an attorney, Charlie Waldrep, to represent him, and the RPC notified Waldrep that the conference was scheduled for August 28.  Neither Waldrep nor Williams attended the conference, however.

RPC terminated Williams' employment effective August 31, 2007, sending a certified mail letter to Williams dated August 30, 2007, advising him of that action.  The letter advised Williams that he had the right to appeal the termination decision.  Williams responded to the letter on September 10, 2007, saying that the accusations against him were "half-truths and outright lies," and demanding that he not only be put back to work, but that he be given a promotion and a raise.  He also requested an appeal conference with Ball, which was held on September 17, 2007.  Two days later, Ball mailed a certified mail letter to Williams advising him that the termination decision would stand.  On October 7, 2007, Williams wrote Ball inquiring when he could expect Ball's decision from the appeal conference.  Ball responded that he mailed a certified letter to Williams on September 19, but it was returned as "unclaimed."

Williams filed a complaint with the EEOC on January 17, 2008, alleging that he was discriminated against by RPC in violation of the Americans with Disabilities Act and the Rehabilitation Act.  After receiving his right-to-sue letter, he filed the instant complaint, asserting

that he suffers disabilities due to hypoglycemia, a back injury, and bipolar disorder, and that RPC discriminated against him on account of his disabilities. In support of his claims of disability, Williams testified during deposition that he had been diagnosed with hypoglycemia by an endocrinologist in 1996, that he had been told by an orthopaedist that he has "crushed vertebrae" from a sports injury in his youth, and that he has been diagnosed with a bipolar disorder. Strangely, the depressive phase of Williams' claimed bipolar disorder affects him only on Wednesdays, when most of his absenteeism occurred. He offered no medical evidence of any of these claims and there is no evidence that he receives medical treatment for them.

DISCUSSION

Plaintiff alleges that his termination by RPC was discriminatory based on his disabilities. RPC's motion for summary judgment seeks summary dismissal of plaintiff's claims, contending that plaintiff has not established a *prima facie* case of disability discrimination, and because he has failed to show that RCP's articulated reasons for his termination — his poor attendance record and poor job performance — were a mere pretext for discrimination.[2]

---

[2] Defendant further asserts, without legal support, that plaintiff's claim must fail because he has not shown that his alleged disabilities were the sole cause of his termination. This argument does not comport with the Eleventh Circuit Court of Appeals' interpretation of the ADA's "but for" causation requirement. See McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1074 (11th Cir. 1996); see also Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1334 (11th Cir. 1999). As the court of appeals noted recently, "[P]laintiffs claiming intentional discrimination under the [Rehabilitation Act] must show that they were discriminated against '*solely* by reason of [their] disability,' 29 U.S.C. § 794(a) (emphasis added), but the ADA requires only the lesser 'but for' standard of causation." Schwarz v. City of Treasure Island, 544 F.3d 1201, 12121 n.6 (11th Cir. 2008). Eleventh Circuit cases teach that the "but for" standard of causation is met if the protected status of the plaintiff was "a motivating factor" in the adverse employment decision, that is, that it

To state a claim for relief under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the plaintiff must "show that he: (1) had a disability; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on his disability." Collado v. United Parcel Service, Co., 419 F.3d 1143, 1149 (11th Cir. 2005) (citing Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004)). The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); see also Collado, 419 F.3d at 1154.

The Supreme Court has noted that "[m]erely having an impairment does not make one disabled for purposes of the ADA." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 195, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002).[3] The Act specifically provides that temporary conditions, even if very severe, are not "disabilities" for purposes of the Act. 42 U.S.C. § 12102(3)(B). An impairment, to be a disability under the ADA, must be permanent or long term. 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii). Moreover, to constitute a covered disability, the impairment must "substantially limit" the plaintiff in a "major life activity." 42 U.S.C. § 12102(1)(A). "Substantially" has been defined to mean "considerable" or "to a large degree." Toyota, 534 U.S. at 196. Major life activities include

---

made a difference in the outcome of the employment decision. See McNely at 1077; Farley at 1334.

[3] The definition announced in Toyota was superceded by legislation when Congress enacted the ADA Amendments Act of 2008 on September 25, 2008, and the term "substantially limits" was broadened to include a wider range of disabilities. The conduct at issue in this case took place before the amendments were passed, and, even under the more liberal standard, this plaintiff has failed to show any "substantial limitation" to any major life activity. See Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 34 n.3 (1st Cir. 2009)(noting that the Amendments Act is not retroactive).

such functions as walking, seeing, hearing, speaking, breathing, learning, and working.  29 C.F.R. § 1630.2(i).

Under the undisputed evidence here, plaintiff is unable to make out a *prima facie* case of disability discrimination.  First, the only evidence that Williams suffered from any of the conditions about which he complains – hypoglycemia, bipolar disorder, and a "crushed disc" in his back – is that he has testified that some unnamed doctors told him, more than a decade ago, that he has these conditions.  He has offered no medical evidence to support these diagnoses or to establish that he has or is receiving treatment for any of them.  Such conclusory, self-serving testimony alone cannot serve to create a genuine issue of material fact where the defendant has pointed out in its motion for summary judgment the absence of such evidence.  See, *e.g.*, Paleologos v. Rehab Consultants, Inc., 990 F. Supp. 1460, 1464 (N.D. Ga. 1998)(finding that allegations that plaintiff suffered from stress, anxiety, and depression and was treated by a doctor for those disorders were merely "conclusory" and failed to establish that she suffered from an impairment as defined by the ADA).[4]  Although there appears to be no strict requirement that expert medical testimony must be offered in support

---

[4] Defendant also argues that plaintiff's testimony concerning medical diagnoses reported to him is inadmissible hearsay.  As one court said in Holt v. Olmsted Tp. Bd. of Trustees, 43 F.Supp. 2d 812, 819 (N.D.Ohio, 1998), "Although Plaintiff has personal knowledge of her diagnoses, she may not testify to those facts in the Affidavit.  The diagnoses of Holt's doctors may only be established through admission of the relevant doctors' records pursuant to Fed.R.Evid. 803(6) or the sworn testimony of these doctors."  Thus, plaintiff's mere recollection of medical diagnoses communicated to him is not admissible to prove the truth of the diagnoses.  See also Frank v. Plaza Const. Corp., 186 F.Supp. 2d 420, 433 (S.D.N.Y.,2002).  For that same reason, such testimony cannot be made admissible at trial.  Williams would not be able to testify as a witness to medical diagnoses stated to him in the past because it would be hearsay if the testimony were offered to prove the truth of the diagnoses.

of all ADA claims, virtually every case in which a plaintiff prevails includes some offer of medical evidence.  This particularly true where the nature of the disability is one not readily apparent to a layperson, such as paralysis or blindness.  It has been noted that a "failure to provide the Court with competent medical evidence dooms [a plaintiff's] claims since plaintiffs in ADA cases have 'the burden of establishing with medical evidence the existence of the alleged disability.'"  Stone v. Sangamon County Sheriff's Dep't, 168 F. Supp. 2d 925, 931 (C.D. Ill.  2001).

Other courts have recognized that a plaintiff in an ADA action must do more than allege that he has a disability.  "Merely having an impairment does not make one disabled for purposes of the ADA."  Cody v. County of Nassau, 577 F. Supp. 2d 623, 638 (E.D.N.Y. 2008).  Evidence of a medical diagnosis of an impairment is "insufficient" to prove that a plaintiff is disabled.  Simpson v. Alabama Dep't of Human Resources, 311 Fed. Appx. 254, 267 (11th Cir. 2009).  Furthermore, a plaintiff must demonstrate that the impairment is "permanent" or "long-term" in order to qualify under the ADA.  Toyota, 534 U.S. at 198.

In this case, the plaintiff must come forward with admissible evidence to establish at leasst a genuine issue of fact with regard to a physical or mental impairment that rises to the level of an ADA disability, and he has not done so.  Although he claims to have hypoglycemia, a bipolar disorder, and crushed vertebrae, he has offered no admissible evidence to prove any of them.  These purported infirmities are not the type that are readily apparent without medical evidence, but, indeed, are precisely the type that require medical evidence to prove their existence and severity.  Simply put, there is no evidence creating a genuine issue of material fact concerning whether plaintiff even has impairments that are a "disability" within the meaning of ADA or the Rehabilitation Act.

In addition to evidence that the plaintiff has a physical or mental impairment, the plaintiff must further demonstrate that the impairment, if it exists, "substantially limits a major life activity." The term "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i), (ii). Simpson, 311 Fed. Appx. at 267.  A determination of whether an impairment substantially limits a major life activity requires the court to consider the "nature and severity of the impairment; ... the duration or expected duration of the impairment; and ... the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i-iii); Simpson, 311 Fed. Appx. at 267.

In plaintiff's brief filed in opposition to the instant motion, he fails to identify any "major life activity" that is limited by any of his alleged impairments.  In his deposition, plaintiff testified that he cannot go long periods without eating and must have orange juice and peanuts available to him. Construing his allegation liberally, the court could find that he asserts that his hypoglycemia significantly limits the major life activity of working.  However, plaintiff admits he was allowed to keep his orange juice in the office refrigerator, and he does not allege that he was not able to eat or drink at his desk whenever he wanted.  He merely alleges that he was not allowed to *leave* for a meal at any time that he wanted after his work schedule was changed in 2007.  While plaintiff asserts that he had been allowed to do so prior to the change in his work schedule, he does not contend that he

ever told RPC that he was disabled, or that he requested a flexible meal schedule as a reasonable accommodation.  Futhermore, there is no evidence that plaintiff's hypoglycemia required any accommodation other than access to orange juice and peanuts, which plaintiff undisputedly had at all times.

As to his alleged bipolar disorder, plaintiff merely alleges that he would have periods of reduced productivity, followed by periods of increased energy.  While he asserts that he suffered his "down days" every Wednesday during 2007, he does not assert that any major life activity was "substantially limited" as a result of his alleged bipolar disorder.  Again, assuming that he is arguing that he was limited in his ability to work, plaintiff has failed to support this claim with any evidence that his "down days" were so severe that he was unable to attend work.[5]  Moreover, the employer has the right to insist that an employee attend work during working hours, and allowing excessive absences is not a reasonable accommodation that must be granted.  Paleologus, 990 F. Supp. at 1466-67(noting that the "most essential function of any job, and a prerequisite to the performance of other essential functions, is attendance at work").

Finally, plaintiff asserts that he suffers from crushed discs in his back.  The only "activity" allegedly impacted by his back injury was the ability to move heavy objects "quickly." (Complaint, ¶ 22).  Although lifting may be deemed a major life activity, this court finds plaintiff's allegations regarding the moving of furniture simply ludicrous.  An employer cannot be held hostage by an

---

[5] It is undisputed that plaintiff failed to attend work on a regular basis, even when he was working a part-time schedule.  Because plaintiff failed to attend work even on a 30-hour-per-week schedule, it seems unlikely that even an accommodation of "Wednesdays off" would have made it possible for plaintiff to perform the essential functions of his job.

employee who reconfigures the office on his own, and in defiance of his employer's refusal to provide a larger workspace, and then simply refuses to return the office to its original configuration within 60 days. Plaintiff's situation reeks of insubordination, not discrimination.

A review of ADA caselaw indicates that the burden of proving the disability lies with the plaintiff, and generally includes presentation of medical evidence, not only as to the existence of some mental or physical impairment, but also as to the limitations caused by the impairment. Even if plaintiff's own statements were sufficient evidence to meet his burden of showing that he suffered from any of those conditions, they still do not prove that he is disabled as defined by the ADA because there is insufficient evidence as to the nature, severity, or longevity of the conditions.[6]

It is further true that, even if plaintiff's self-serving statements regarding his medical conditions were determined sufficient to prove that he was disabled, plaintiff has failed to demonstrate that he was otherwise qualified to do the job. A "qualified individual" under the ADA is an employee who "with or without reasonable accommodation, can perform the essential functions" of the job. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).[7] Although plaintiff has

---

[6] Plaintiff also attempts to argue that he is covered by the ADA because he was "regarded as" having a disability. The only evidence he offers in support of such a claim is that Foisy told someone that *Williams had said* he had bipolar disorder, and that everyone in the office knew that he had to eat often to avoid problems with his blood sugar. Such evidence is insufficient to prove that Williams was "regarded" as disabled by the RPC.

[7] Although neither party has addressed the issue, the court further notes that one element that plaintiff must demonstrate as part of his *prima facie* showing is that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3)(ii)(C); see, *e.g.*, Boykin v. Honda Mfg. of Ala., 288 Fed. Appx. 594 (11th Cir 2008). Plaintiff does not describe any such jobs from which he claims to be disqualified because of his impairment, and it is well settled that the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. 29 C.F.R. § 1630.2(j)(3)(i).

testified as to his superior skills, and has stated that he was a "star performer" at the RPC, it is undisputed that he failed to complete tasks in a timely fashion or to attend work on a regular basis.

Except in the case of his alleged hypoglycemia, plaintiff has failed to identify the accommodation "that actually would have allowed [him] to perform [his] job duties." Willis v. Conopco, 108 F.3d 282, 284-85 (11th Cir. 1997). In Willis, the Eleventh Circuit Court of Appeals established that the ADA placed on the plaintiff the burden of production and persuasion as to a reasonable accommodation that should be made available. In this case, plaintiff has failed to name any reasonable accommodation, other than flexible mealtimes, that would make it possible for him to perform his job despite his alleged disabilities.[8] While plaintiff might have preferred flexible mealtimes, it is undisputed that having orange juice and food available to him was adequate to control his hypoglycemia, and, thus, was a reasonable accommodation. Plaintiff has not described any manner in which his alleged bipolar disorder could be addressed by a reasonable accommodation, or any manner in which his alleged back injury requires or could be remedied through a reasonable accommodation.

In the instant case, Williams was warned that his failure to complete tasks and attend work as scheduled would result in his termination. In spite of the warning, Williams failed to correct the

---

[8] The court notes that, to the extent plaintiff argues that a more flexible work schedule would have been a reasonable accommodation, his argument has no basis in fact because plaintiff was unable to meet the attendance requirements of his job even when he was given a flexible, part-time schedule. Plaintiff's arguments that "every other employee" of the RPC was able to take flexible meal times and work on a more flexible schedule further supports a conclusion that the flexible work schedule was not a "reasonable accommodation" provided for his disability. Moreover, it is clear that the inflexibility imposed on the plaintiff after January 2007 (which amounted to nothing more than a requirement that he keep ordinary office hours) was a result of his own failure to perform when given the freedom of a more flexible schedule.

deficiencies.  He never expressed to his employer that his alleged disabilities made it impossible for him to meet the requirements of the job.  He never asked for any reasonable accommodation, and still has failed to identify any reasonable accommodation that would permit him to perform the job satisfactorily.  He has demonstrated an *unwillingness* to meet his employer's simple demands for attendance and completion of work; not an *inability* to do so.[9]  Consequently, plaintiff has failed to raise any inference that the defendant's offered explanation for his termination was a mere pretext for prohibited discrimination.

Thus, because plaintiff cannot prove a *prima facie* case of disability discrimination, and because RPC's given reason for his termination is worthy of credence, RPC's motion for summary judgment is due to be granted.

---

[9]  One telling example of plaintiff's obstinance is that he was repeatedly reprimanded for failing to timely respond to and delete emails, causing his mailbox to always be full.  Plaintiff admits that his mailbox remained full most of the time, making it impossible for others to leave him voice messages.  In addition, he agrees that he often had a large number of unopened emails in his box.  In spite of his employer's demand that the emails be more promptly addressed, plaintiff merely sought a "larger" mailbox.  Williams consistently made excuses for his failure to meet the employer's demands, but shows no evidence that he made any consistent efforts to meet them.

## CONCLUSION

The court finds that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law.  By separate order, the court will grant the defendant's motion for summary judgment and dismiss this action with prejudice.

DONE this 25th  day of February, 2010.


_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE